IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JIMMIE D. McDONALD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 12-cv-607-CJP |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant.[1] | ) |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jimmie D. McDonald is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[2]

### Procedural History

Mr. McDonald applied for benefits in April, 2009, alleging disability beginning in January, 2009. (Tr. 142, 146). The application was denied initially and on reconsideration. After holding a hearing, ALJ Michael Scurry denied the application for benefits in a decision dated March 25, 2011. (Tr. 20-28). Plaintiff's request for review was denied by the Appeals Council,

---

[1] Carolyn W. Colvin was named Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 25.

and the decision of the ALJ became the final agency decision.   (Tr. 1).

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issue Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ should have given more weight to the opinion of plaintiff's treating doctor, Dr. Sunga.

2. The ALJ failed to properly consider the effects of plaintiff's obesity.

3. The ALJ's determination of plaintiff's credibility was faulty.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**  However, limitations arising from alcoholism or drug use are excluded from consideration of whether a claimant is disabled.   **42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535.**

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572**.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. McDonald was, in fact, disabled at the relevant time, but whether the ALJ's findings

were supported by substantial evidence and whether any errors of law were made.   See, **Books v. Chater**, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).

This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   **Brewer v. Chater**, **103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, **Parker v. Astrue**, **597 F.3d 920, 921 (7th Cir. 2010),** and cases cited therein.

## The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above.   He determined that Mr. McDonald had done some work which rose to the level of substantial gainful activity since the alleged onset date, but only for a short time.   Plaintiff had also worked part-time. He had severe impairments of left shoulder tendonosis without a tear, osteoarthritic changes in the left shoulder with mild bursitis, mild degenerative disc bulge at L5-S1, facet arthropathy at L4-5 and L5-S1, cleft palate and obesity.   The ALJ determined that plaintiff's impairments do not meet or equal a listed impairment.

ALJ Scurry gave little weight to Sunga's opinion as to plaintiff's RFC.   Based on the report of an examining doctor and a state agency consultant, he concluded that Mr. McDonald had the residual functional capacity to perform a limited range of work at the medium exertional

level.  Relying on evidence from a vocational expert, the ALJ found that plaintiff had the capacity to perform his past relevant work.  (Tr. 20-28).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

**1.     Agency Forms**

Mr. McDonald was born in 1958, and was almost 51 years old when he allegedly became disabled.  He is insured for DIB through December 31, 2013.  (Tr. 160).

In a Disability Report, submitted in May, 2009, plaintiff said he was 6' 1" tall and weighed 240 pounds.  He said he was unable to work because of "cleft palate, skin cancer on forehead." He stopped working on January 8, 2009 because "I had to stop working so I could take care of my mother."  (Tr. 164-165).  Plaintiff had previously worked as fork lift operator, a laborer and a limousine driver.  (Tr. 166).

In June, 2009, Mr. McDonald said that his left arm hurt when he used it and he had pain in his right hip.   He said that a bone had been taken from his hip in the 1970s for use in repairing his cleft palate.  He said that nobody would hire him because of his cleft palate, and he had gotten his past jobs only because "they know me."  (Tr. 192).  Plaintiff also alleged breathing problems, difficulty walking, bad eyesight and hearing loss.  (Tr. 238).

Plaintiff graduated from high school, and had not been in special education classes.  (Tr. 169).

**2.     Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing on March 23, 2011   (Tr. 35).

Mr. McDonald was 6'1" tall and weighed 255 pounds. (Tr. 38). He lived with his mother. (Tr. 39). He stopped working in January, 2009, because his pain got bad, and he moved in with his mother to help her. She had cancer. (Tr. 41-42). He had pain in his low back and right hip, going down his leg. A piece of bone had been removed from his hip in the 1970s to use to repair his cleft palate. The repair did not work. (Tr. 42, 52). He has always had trouble breathing because of his cleft palate. He also had pain in his left shoulder, and could not raise his arm all the way up. He took ibuprofen for pain. (Tr. 53-54).

At the time of the hearing, he was working four days a week, two hours a day, taking care of an elderly man. Before that, he took care of a man for six days a week, six hours a day. He did that for thirty days, until January of 2011. (Tr. 44-46). Working for six hours a day caused him a lot of pain, and he did not think he could do that long-term. (Tr. 56-57). Sitting for 45 minutes at the hearing made him "miserable." (Tr. 58).

On a typical day, he worked for two hours, came home and took a nap, and watched television. (Tr. 54).

A vocational expert (VE) also testified. The ALJ asked him to assume a person able to lift 50 pounds occasionally and 25 pounds frequently and stand/walk or sit for 6 out of 8 hours, but limited to only frequently pushing/pulling and reaching overhead with the left arm and no climbing of ladders, ropes or scaffolds. The VE responded that he could do plaintiff's past work as a forklift operator. A limousine driver, powder machine operator and barge cleaner. (Tr. 61).

3.   **Medical Records**

Dr. Adrian Feinerman performed a consultative physical examination on July 13, 2009. There are no treatment records prior to that date. Mr. McDonald complained of a speech impediment and breathing problems resulting from a cleft palate, right hip pain and left shoulder

pain.  He also complained of headaches and ringing in his ears.  He told Dr. Feinerman that he could walk for one-fourth of a mile, and was able to sit, stand, squat, bend, and perform fine and gross manipulations normally.  On exam, he had purulent material in his right ear canal.  He had limited range of motion of the left shoulder.  The range of motion of the spine was full.  Grip strength was full and equal.  Ambulation was normal, and he was able to tandem walk, toe walk, heel walk, hop, squat, and rise from a chair without difficulty.  Muscle strength was normal with no spasm or atrophy.  Straight leg raising was negative.  His speech was difficult to understand.  The impression was status post repair of cleft palate and skin cancer; right purulent otitis; decreased hearing; left rotator cuff tear.  (Tr. 329-338).

The record reflects no medical treatment until Mr. McDonald saw Dr. Sunga for the first time on February 12, 2010.  He said he had severe right hip pain since 1985 with shooting pain in his right thigh.  He had "chronic" back pain, and left shoulder pain for the past ten months.  The assessment was lumbar pain with radiculopathy, chronic hip pain, and shoulder pain with osteoarthritis, rule out torn ligament.  Dr. Sunga prescribed Lorcet for pain and ordered x-rays.  (Tr. 428).  X-rays showed degenerative arthritis in the left shoulder and lumbar spine, but the right hip was normal.  On March 18, 2010, Dr. Sunga continued his medication and noted that he had no side effects.  He recommended MRI of the left shoulder and lumbosacral area.  (Tr. 423).  On April 23, 2010, plaintiff reported that he had been unable to get into the MRI tube because of shortness of breath.  He was still having pain.  Dr. Sunga increased the dosage of his pain medication   (Tr. 417).

Dr. Sunga ordered an open MRI, but plaintiff said he was unable to afford the co-pay, so Dr. Sunga decided to try a closed MRI with Xanax.  (Tr. 414, 416).  MRI studies of the left shoulder and lumbosacral area were successfully done in May, 2010.  The left shoulder study

showed tendonitis, osteoarthritic changes and bursitis, but no tear. (Tr. 355). The lumbosacral spine study showed a mild degenerative disc bulge at L5-S1, with no nerve root impingement, focal herniation or spinal stenosis. (Tr. 356).

In June, 2010, Mr. McDonald told Dr. Sunga that he had to take more pain medication because he had been more active. He had no side effects from his medications. Dr. Sunga prescribed Lorcet, aspirin and ibuprofen, and counseled him not to take more medication than was prescribed. (Tr. 410).

Mr. McDonald was seen by a physician's assistant in Dr. Sunga's office on August 11, 2010. He complained of pain radiating into his right leg down to his ankle. On exam, he had bilateral tenderness in the lumbar area, with positive straight leg raising on the right. He had decreased range of motion of the left shoulder in all directions. She recommended that he be evaluated for physical therapy. (Tr. 408-409).

The physical therapy evaluation was done at Hardin County General Hospital on August 16, 2010. The range of motion of the right hip was limited, and plaintiff had grade 2-3 tenderness in the right hip region, going into the lateral thigh. The muscles of the back were a little tight and the therapist noted muscle spasms. Extension of the spine was limited to 10 degrees. He was able to forward bend and side bend, but trunk rotation was limited "secondary to body composition." Plaintiff reported difficulty in walking and climbing stairs due to pain. The therapist recommended that he be treated once a week for four weeks. (Tr. 384-387). There are no additional records documenting whether plaintiff attended physical therapy.

Plaintiff returned to Dr. Sunga on September 16, 2010. He was there for a "regular checkup" and to have a form for disability filled out. He complained that he was still having " a lot of shoulder pain, back pain." His pain medication made him less anxious and depressed. He

was able to shop more, but had difficulty sitting, standing and walking for a long time.   On exam, the doctor noted that he was obese.   He had left shoulder tenderness with limitation of range of motion and lumbar tenderness.   The assessment was chronic left shoulder tendonitis with glenohumeral osteoarthritis and AC joint bursitis; chronic back pain with bulging disc and right leg radiculopathy; and cleft palate status post surgery.   Dr. Sunga prescribed Motrin and Lorcet as needed, and a low-dose aspirin daily.   (Tr. 406).

Mr. McDonald continued to be seen by Dr. Sunga or his physician's assistant approximately once a month through February 11, 2011.   On the last visit, Dr. Sunga noted that he had lumbar tenderness and positive straight leg raising on the right.   (Tr. 433).

**4.**   **Dr. Sunga's Report**

Dr. Sunga assessed plaintiff's ability to do work-related physical activities by filling out a form on September 16, 2010.   He opined that plaintiff was able to sit, stand and walk for only 20 minutes at a time, sit for a total of 4 out of 8 hours, and stand/walk for a total of 4 out of 8 hours.  He must be able to change positions at will every 20 minutes and take unscheduled breaks.   He could only occasionally reach or push/pull with his left hand.   In section IX of the form, Dr. Sunga answered a question about any other limitations by pointing out that plaintiff had a cleft palate and had difficulty talking in spite of surgery.   The next question asked for the "earliest date the description of symptoms and limitations on this questionnaire applied."   Dr. Sunga answered, "at birth."   (Tr. 391-396).

**5.**   **State agency consultant assessment of RFC**

In July, 2009, state agency consultant C.A. Gotway, M.D., assessed plaintiff's RFC based on a review of the records.   At that point, Dr. Feinerman's report was the only medical record on file.   Dr. Gotway opined that plaintiff was able to do medium work, i.e., he was able to frequently

lift 25 pounds, occasionally lift 50 pounds, stand/walk for 6 out of 8 hours, and sit for 6 out of 8 hours.  See, 20 C.F.R. §404.1567(c).  He opined that plaintiff's ability to reach overhead with his left arm was limited because he had limited range of motion in the left shoulder, and that he should never climb ladders, ropes or scaffolds for the same reason.  He also noted that plaintiff's speech was difficult to understand because of his cleft palate.  (Tr. 339-346).

## Analysis

Plaintiff's first point, regarding the weighing of Dr. Sunga's opinion, is well-taken.

Dr. Sunga was a treating doctor.  Social security regulations refer to a treating doctor as a "treating source."  With regard to the assessment of treating source opinions, 20 C.F.R. §404.1527(d)(2) states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [Emphasis added][4]

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. §404.1527(a)(2).  A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.  ***Clifford v. Apfel*, 227 F.3d**

---

[4] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he is required to evaluate the treating doctor's opinion and determine what weight to give it considering the factors set forth in 20 C.F.R. §404.1527(d).  An ALJ must give "good reasons" for discounting a treating doctor's medical opinion; if the opinion does not merit controlling weight, the ALJ must consider the "checklist of factors" set forth in §404.1527(d).  **Campbell v. Astrue,** 627 F.3d 299, 308 (7th Cir. 2010), citing *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

ALJ Scurry discussed Dr. Sunga's report in one paragraph at Tr. 26.  He gave two reasons for giving Dr. Sunga's opinion little weight.  First, he said that it was "unsupported by the longitudinal evidence of record and the claimant's reported daily activities."  Secondly, he said that "Dr. Sunga's assertion that the limitations and symptoms he described were present since birth is totally unsupported by the objective evidence, especially given the claimant's ability to work at the level of substantial gainful activity in the past."

The ALJ did not give "good reasons" for rejecting Dr. Sunga's opinion.  His statement that Dr. Sunga's opinion is not supported by the longitudinal evidence is meaningless in the absence of an explanation of what is meant by the term "longitudinal evidence."  If this phrase refers to the medical evidence, the ALJ failed to explain how Dr. Sunga's opinion was contrary to his own treatment notes, which were the only longitudinal medical evidence in the record.  The ALJ did not discuss Dr. Sunga's treatment notes except to say that they were "essentially normal, reflecting conservative treatment for his impairments.  (Tr. 26, referring to Ex. 10F, Dr. Sunga's office notes).  This is a mistaken view of Dr. Sunga's notes, as they are not "essentially normal."  On the contrary, the notes reflect abnormal findings on each visit, including positive findings on

MRI studies, limited range of motion, tenderness and positive results on straight leg raising tests. Obviously, a mistaken view of the medical evidence does not constitute an acceptable reason for rejecting a treating doctor's opinion.  See, **Roddy v. Astrue**, 705 F.3d 631, 637 (7th Cir. 2013), holding that the ALJ erred in rejecting doctor's opinion on the basis that MRIs were essentially unremarkable where the MRIs actually showed mild to moderate disc degeneration and cartilage tear.

The ALJ was also mistaken in his interpretation of Dr. Sunga's statement that Mr. McDonald's limitations had been present from birth.  The question posed on the form filled out by the doctor asked, "What is the earliest date the description of symptoms and limitations on this questionnaire applied?"  One of the "symptoms and limitations" identified by Dr. Sunga was difficulty talking caused by a cleft palate.  The only reasonable interpretation of Dr. Sunga's answer was that he was saying the cleft palate had been present from birth; the fact that Mr. McDonald had been able to work did not contradict the assertion that his cleft palate had been present from birth.  The ALJ's interpretation, that Dr. Sunga was saying that *all* of the symptoms and limitations he identified had been present from birth, was patently unreasonable.  A patently unreasonable explanation cannot support the rejection of a doctor's opinion.  See, **Roddy**, **supra,** **705 F.3d at 637**, holding that an ALJ is "required to provide a sound explanation" for rejecting a treating doctor's opinion.

Rather than defend the reasons given by the ALJ, the Commissioner argues that other reasons, not endorsed by the ALJ, would support his rejection of Dr. Sunga's opinion.  For instance, the Commissioner points out that Mr. McDonald evidently did not follow up on the recommendation for physical therapy and Dr. Sunga had only been treating plaintiff for nine months as of the date of his report.  Because these reasons were not relied upon by the ALJ,

however, they cannot be relied upon here in defending his decision.   The ALJ's decision cannot be upheld based upon the Commissioner's after-the-fact rationalization.   ***Hughes v. Astrue,* 705 F.3d 276, 279 (7th Cir. 2013)** ("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine….."); ***McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010)** (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision....").

Because of the disposition of plaintiff's first point, the Court will not discuss his other points in detail.   However, regarding the credibility analysis, plaintiff correctly points out that ALJ Scurry used the boilerplate language that has been repeatedly criticized by the Seventh Circuit.   See, ***Shauger v. Astrue***, **675 F.3d 690, 696 (7th Cir. 2012)**, and cases cited therein.   However, it is not the use of the boilerplate language in and of itself which is objectionable; it is the use of the boilerplate language unaccompanied by findings which are supported by evidence in the record.   ***Shauger, ibid***.   The Seventh Circuit has made it plain that, if the ALJ "has otherwise explained his conclusion adequately, the inclusion of this [boilerplate] language can be harmless." ***Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).**

Here, the ALJ's credibility determination rested on several improper bases.   He emphasized that plaintiff was able to work part-time and to do daily activities such as preparing simple meals, doing laundry, reading a newspaper and watching television.   The Seventh Circuit has repeatedly pointed out that the ability to work part-time or to struggle through basic daily activities does not mean that a claimant has the ability to sustain full-time employment.   ***Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), and cases cited therein;** ***Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).**   Again, the Commissioner defends the decision based on reasons not relied upon by the ALJ, such as plaintiff's alleged inconsistency in identifying the basis for his

disability.

Because of the ALJ's errors, this case must be remanded.  The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. McDonald was disabled during the relevant time period or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

There are only two avenues for remanding a social security case.  Remand can be ordered pursuant to sentence four or to sentence six of 42 U.S.C. § 405(g).  A sentence four remand depends upon a finding of error, and is itself a final, appealable order.  In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct.  A sentence six remand is not an appealable order.  See, ***Melkonyan v. Sullivan*, 501 U.S. 89 (1991); Perlman *v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7th Cir. 1999).**  Here, a sentence four remand is appropriate.

## Conclusion

The Commissioner's final decision denying Jimmie D. McDonald's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:**   April 4, 2013.

s/ Clifford J. Proud
**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**